**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| STANLEY C. BRASCH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:05-CV-222 CAS |
| | ) |
| MARY E. PETERS, in her official | ) |
| capacity as Secretary of Transportation,[1] | ) |
| | ) |
| Defendant. | ) |

**AMENDED MEMORANDUM AND ORDER**

This matter is before the Court on defendant's motion to dismiss or in the alternative for summary judgment. Plaintiff opposes the motion. For the following reasons the Court will grant the alternative motion for summary judgment with respect to all claims.

**Background**

Plaintiff Stanley Brasch filed this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq., against the United States Department of Transportation for employment discrimination based on religion (Judaism), national origin (Jewish),[2] and retaliation. Brasch alleges

---

[1]Mary E. Peters became the Secretary of Transportation on September 30, 2006. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Mary E. Peters should be substituted for Norman Y. Mineta as defendant in this suit.

[2]It is not clear from the record whether plaintiff alleged national origin discrimination in the EEO complaint which forms the basis underlying this action, and therefore it is not clear whether such a claim was administratively exhausted. Further, although plaintiff alleges that he is Jewish, he does not allege that he or his ancestors are from a country other than the United States. Generally, "[t]he term 'national origin' on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came." Espinoza v. Farah Mfg. Co., 414 U.S. 86, 88 (1973). Although at least one court concluded, in a race and national origin discrimination case brought by a Jewish/Hebrew plaintiff from Israel, that it could properly consider whether evidence about national origin discrimination might have significance regarding the race discrimination claim, see Sinai v. New England Tel. and Tel. Co., 3 F.3d 471, 474-75 (1st Cir. 1993), this Court has not found any cases

twenty-nine separate acts of retaliation, disparate treatment, and discrimination which he claims have

occurred and are ongoing in his employment with the Federal Aviation Administration ("FAA" or the

"agency"). Plaintiff's primary claim concerns a fourteen-day suspension without pay which he

received in 2002. Plaintiff asserts that he was denied due process in connection with the suspension,

and that both the suspension and the denial of due process were acts of retaliation and discrimination.

Defendant moves to dismiss, or in the alternative, for summary judgment, on the basis that plaintiff

has failed to exhaust administrative remedies and has failed to set forth a prima facie case of

discrimination or retaliation. Defendant also asserts that if the Court were to find that plaintiff

established a prima facie case, plaintiff cannot show that defendant's legitimate nondiscriminatory

reasons for its actions are a pretext for illegal discrimination.

## Legal Standard

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) must be treated as

a motion for summary judgment when matters outside the pleadings are presented and not excluded

by the trial court. Hamm v. Rhone-Poulenc Rorer Pharm., Inc., 187 F.3d 941, 948 (8th Cir.1999),

cert. denied, 528 U.S. 1117 (2000); Woods v. Dugan, 660 F.2d 379, 380 (8th Cir. 1981) (per

curiam). When matters outside the pleadings are presented on a motion to dismiss, as in this case,

the Court may either treat the motion as one to dismiss and exclude the matters outside the pleadings,

or treat the motion as one for summary judgment and provide the parties with notice and an

opportunity to provide further materials. See Gibb v. Scott, 958 F.2d 814, 816 (8th Cir. 1992). As

---

which hold that a plaintiff who does not allege that he or his forebears came from a foreign country
can assert a national origin discrimination claim. Plaintiff's national origin claims are therefore
dismissed. Even if the Court were to assume that plaintiff's national origin claims were properly
pleaded and exhausted, the result would be the same as with plaintiff's religious discrimination
claims, because plaintiff does not offer any separate evidence with respect to the purported national
origin claims.

defendant's motion was alternatively captioned as a motion for summary judgment, plaintiff has had adequate notice and opportunity to provide further materials. See Gibb, 958 F.2d at 816. The Court notes that plaintiff submitted 193 exhibits of his own in opposition to the motion for summary judgment. The Court will therefore address defendant's alternative motion for summary judgment.

The standards applicable to summary judgment motions are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The initial burden is placed on the moving party. City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc., 838 F.2d 268, 273 (8th Cir. 1988) (the moving party has the burden of clearly establishing the non-existence of any genuine issue of fact that is material to a judgment in its favor). Once this burden is discharged, if the record shows that no genuine dispute exists, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on a material factual issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

Once the burden shifts, the non-moving party may not rest on the allegations in his pleadings, but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); Herring v. Canada Life Assur. Co., 207 F.3d 1026, 1029 (8th Cir. 2000); Allen v. Entergy Corp., 181 F.3d 902, 904 (8th Cir.), cert. denied, 528 U.S. 1063 (1999). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). A dispute about a material fact is "genuine" only "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." Herring, 207 F.3d at 1029 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A party resisting summary judgment has the burden to designate the specific facts that create a triable question of fact. See Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1114 (8th Cir. 2004). "Self-serving, conclusory statements without support are not sufficient to defeat summary judgment." Armour and Co., Inc. v. Inver Grove Heights, 2 F.3d 276, 279 (8th Cir. 1993).

The Eighth Circuit has stated that summary judgment should seldom be used in cases alleging employment discrimination. Kells v. Sinclair Buick-GMC Truck, Inc., 210 F.3d 827, 830 (8th Cir. 2000). Summary judgment is appropriate, however, if the plaintiff has failed to present evidence sufficient to create a jury question as to an essential element of his claim. Whitley v. Peer Review Systems, Inc., 221 F.3d 1053, 1055 (8th Cir. 2000) (citing Chock v. Northwest Airlines, Inc., 113 F.3d 861, 865 (8th Cir. 1997)). "In an employment discrimination case, if evidence of the employer's proffered reason for its action is undisputed, the movant is entitled to a grant of summary judgment." Bassett v. City of Minneapolis, 211 F.3d 1097, 1107 (8th Cir. 2000).

With these standards in mind, the Court finds the following facts as true for purposes of resolving this motion for summary judgment.

**Factual and Procedural Background[3]**

      Plaintiff Stanley Brasch has been employed by the FAA as a Grade Level FV-334-I Computer

Specialist since November 1997. Plaintiff filed an EEO complaint against the agency's Kansas City

Regional Office where he originally worked. Plaintiff states that the EEO complaint raised issues

---

[3]Plaintiff failed to submit a statement of material facts as to which he contends a genuine issue exists, as required by Local Rule 4.01(E). Instead, plaintiff submitted a large three-ring binder containing 193 exhibits, and in response to each paragraph of plaintiff's statement of uncontroverted material facts, stated as follows:

> Plaintiff's objection: Defendant's statement is in controversy. This is a conclusion and not a statement of facts. This statement needs to be determined by the trier of the facts with a jury. Plaintiff is prepared to present evidence at trial controverting the defendant's statement. This is a major part of the plaintiff's case showing retaliation for equal employment opportunity (EEO) protected activities by the defendant.

The Eighth Circuit has explained that "[s]imply providing a massive record does not satisfy" the non-moving party's burden to "identify and provide evidence of specific facts creating a triable controversy." Howard v. Columbia Pub. Sch. Dist., 363 F.3d 797, 800 (8th Cir. 2004) (internal punctuation and citation omitted). Courts are not required to "sort through a voluminous record in an effort to find support for the plaintiff's allegations." Id. (citations omitted).

      The Court finds that plaintiff's objections to the defendant's statement of uncontroverted material facts do not meet the requirements of Local Rule 4.01 (E) and do not suffice to identify the specific facts as to which plaintiff contends a genuine issue of fact exists. Moreover, plaintiff did not provide any citations to the record to support his objections. "The purpose of the rule is to distill to a manageable volume the matters that must be reviewed by a court undertaking to decide whether a genuine issue of fact exists for trial. It is designed 'to prevent a district court from engaging in the proverbial search for a needle in the haystack.'" Jones v. United Parcel Service, 461 F.3d 982, 990 (8th Cir. 2006) (quoting Northwest Bank and Trust Co. v. First Ill. Nat'l Bank, 354 F.3d 721, 725 (8th Cir. 2003) (discussing a Western District of Missouri local rule which is analogous to E.D. Mo. 4.01(E)). In his Response to the defendant's motion for summary judgment, however, plaintiff did cite to approximately twenty of his exhibits.

      For purposes of this motion, the Court therefore deems defendant's statement of uncontroverted material facts admitted for purposes of summary judgment, except where specifically controverted. See Deichmann v. Boeing Co., 36 F.Supp.2d 1166, 1168 (E.D. Mo. 1999); see also Ridpath v. Pederson, 407 F.3d 934, 936 (8th Cir. 2005) (where plaintiff did not controvert defendant's statement of material fact, it was deemed admitted under E. D. Mo. Local Rule 4.01(E)). The Court's recitation of the facts is therefore taken largely from defendant's statement of uncontroverted material facts as well as the underlying record.

under the USERRA concerning his taking of military leave.[4]  Pl.'s Response at 4.  Through a Settlement Agreement reached between plaintiff and the FAA to resolve the EEO complaint, plaintiff was reassigned from Kansas City to the St. Louis Gateway (T75) TRACON Service Support Center ("TRACON-75 SSC") in Bridgeton, Missouri, beginning January 16, 2001.  The Settlement Agreement states in part that the move to St. Louis "is for the benefit of the employee."  Def.'s Ex. B at 2, ¶ 1.a.  The Settlement Agreement also states that "no disciplinary actions will be taken related to Mr. Brasch's employment while assigned to the Resource Management Branch on or before the date of this Settlement Agreement.  This includes Mr. Brasch's detail to the Operations Branch during this timeframe."  Id., ¶ 1.c.  The Settlement Agreement is dated December 21, 2000.  The EEO complaint filed in Kansas City forms the basis for the issues challenged in this action as being retaliatory.

At the time plaintiff transferred to St. Louis, the TRACON-75 SSC was preparing for a move to a new building in St. Charles, Missouri.  Plaintiff remained a FV-334-I Computer Specialist following the reassignment.  The FV-E334-I Computer Specialist is classified as an administrative position.  Plaintiff is the only FV-334-I Computer Specialist assigned to the TRACON-75 SSC, and is supervised by Supervisor David Barr.  All of the other employees supervised by Barr are FV-2101 Airway Transportation System Specialists ("2101 Specialists"), who work on National Air Space equipment at the facility.  The 2101 Specialists are technical, rather than administrative, positions.

_____

[4]USERRA is the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. §§ 4311, et seq.  "The USERRA, enacted in 1994 to improve the Veterans' Reemployment Rights Act, prohibits employment discrimination on the basis of military service. . . . Under the USERRA, an employer violates the act when a person's membership in the uniformed services is a *motivating factor* in the employer's action, 'unless the employer can prove that the action would have been taken in the absence of such membership, application for membership, service, application for service, or obligation for service.'  38 U.S.C. § 4311(c)(1)."  Gagnon v. Sprint Corp., 284 F.3d 839, 852 (8th Cir. 2002), cert. denied, 537 U.S. 1001 (2002).

Plaintiff is responsible for the maintenance of computer systems, work stations, file servers and other equipment that supports the National Air Space equipment maintained by the 2101 Specialists.

Plaintiff filed an EEO complaint on February 7, 2002, alleging retaliation and discrimination regarding the following issues: (1) plaintiff's fourteen-day suspension from work without pay effective February 10, 2002; (2) denial of floating meal break times; (3) denial of "spot leave" in January 2001 and August 2001; (4) exclusion from division telephone conferences from January 2001 through April 2002; (5) denial of work schedule adjustment requests; (6) not reimbursed for compensatory travel time in June 2001; (7) not provided PBX Telephone Systems training; (8) not selected for temporary promotion to Manager, Program Support Unit; (9) management denied his request to serve as a Volunteer Ombudsman; (10) his supervisor Barr warned or advised other employees to be careful in dealing with plaintiff; (11) the agency dictated to plaintiff what route he should drive to work; (12) management located plaintiff in a computer equipment room that is harmful to his health and refused to provide him with other office space outside the computer room in an effort to force him to become sick and lose his job; (13) in June 2002, supervisor Jane Knoche accused plaintiff of damaging a government vehicle; (14) plaintiff did not receive a cash award and/or time off award for his work toward installation of the new TRACON-75 SSC building in St. Charles, Missouri although others did; (15) plaintiff did not receive a Superior Contribution Increase award for work performed during fiscal year 2002; (16) plaintiff did not receive a cash award and/or time off ward for his work on the Labor Distribution Reporting Program while other employees did; (17) the agency denied plaintiff the opportunity to serve as "Acting" TRACON-75 SSC Manager while other employees were granted this opportunity; (18) the agency disapproved plaintiff's request for compensatory time while he was traveling on official duty in July 2003, (19) plaintiff was not

provided with safety shoes; (20) the agency removed plaintiff's duties of providing computer support to the FAA offices of St. Louis NAVCOM, St. Louis RADAR and the St. Louis Facility Manager; and (21) the agency failed to accommodate plaintiff's religion (Judaism) when he was required to stay late and work on the evening of April 16, 2003, when he had previously explained to his supervisor that the evening was a religious holiday.

A hearing was conducted before an Administrative Law Judge ("ALJ") on plaintiff's EEO complaint on March 1 and 2, 2004. Five witnesses testified, including plaintiff, and numerous exhibits were received. By Findings of Fact and Conclusions of Law, the ALJ concluded that plaintiff had waived his right to challenge the agency's dismissal of his claims for denial of spot leave in January and August 2001, and his non-selection for the temporary promotion to Manager, Program Support Unit. The ALJ noted that plaintiff withdrew two issues during the hearing, listed as number (6) above (claim regarding reimbursement of travel time in June 2001), and number (18) above (request for compensatory time while traveling on duty in July 2003). The ALJ discussed each of plaintiff's claims in detail, and concluded that all of the claims lacked merit and there was no evidence of retaliation or religious discrimination. On November 9, 2004, the agency entered its final decision implementing the ALJ's decision. Plaintiff filed an appeal with the United States Equal Employment Opportunity Commission but the appeal was dismissed on February 17, 2005, because plaintiff had filed the instant action on February 3, 2005.

The Court now makes factual findings concerning each of plaintiff's claims.

1. Suspension.

Plaintiff was suspended from work for fourteen days without pay by letter dated January 30, 2002, based on misuse of his government position for personal gain, absence without leave on August

28, 2001, and unauthorized absence from work. Plaintiff's supervisor, David Barr, stated by affidavit that he had never suspended another employee, and had never had another employee engage in similar conduct. Barr Affidavit at 5-6.

The FAA received a complaint from Trans World Airlines (TWA) management in St. Louis about plaintiff using his position as an FAA employee to request and gain a meeting with TWA management officials on August 28, 2001 (the "TWA incident"). According to TWA's complaint, plaintiff had contacted TWA during his working hours, identified himself as being with the FAA, and requested to speak with a manager. The complaint further alleged that when plaintiff arrived at the TWA offices he was displaying his FAA credentials. TWA policy required that at least two managers be present for any meeting with the FAA. At the meeting on August 28, 2001, three TWA managers met with plaintiff. Expecting the meeting to be about an official FAA matter, the three managers were surprised to learn that plaintiff called the meeting to discuss his claim for a tooth injury he allegedly sustained during a TWA flight in 1999 when he bit into food provided by TWA.

The FAA's Civil Aviation Security Division, ACE-700, investigated the TWA complaint to determine if plaintiff had misused his position with the FAA and possibly abused rules concerning time and attendance by his actions on August 28, 2001. During the investigation, plaintiff admitted to FAA investigators that he had contacted TWA during his scheduled work shift, went to its offices during that time without seeking leave from his supervisor, and was displaying his FAA employee badge when he arrived at the TWA offices.

Plaintiff was given more than one opportunity prior to the actual suspension to "present his side of the story" concerning his contact with TWA on August 28, 2001. Plaintiff was interviewed by Special Agent Danny W. Simpson, the agent conducting the investigation, on October 4, 2001.

Plaintiff's union representative was present during the interview. Simpson explained the purpose of the meeting prior to beginning the interview. Plaintiff was allowed to provide a written statement of his account of the event on October 9, 2001, and was given another opportunity to offer further comment on October 11, 2001.

Plaintiff's supervisors, David Barr and St. Louis Field Office Facility Manager Jane Knoche, conducted an investigatory interview (the "Weingarten interview"[5]) of plaintiff on November 26, 2001 to raise some questions they had regarding the FAA's Final Report of Investigation ("ROI") into the TWA incident. Plaintiff had advance knowledge of the purpose of the Weingarten interview, had union representation at the interview, and was allowed to provide a written response to the proposed suspension. Plaintiff was presented with the proposed suspension by a letter dated December 13, 2001, at a meeting with his supervisors and a union representative. In addition, plaintiff had a second meeting with them on this issue on December 17, 2001. Plaintiff was ultimately suspended from work for fourteen days without pay by letter from Barr dated January 30, 2002.

2. "Floating" Lunch Breaks.

Administrative employees, such as plaintiff, are not entitled to have floating lunch breaks, although technicians in the unit, the 2102 Specialists, are allowed floating lunch breaks. Barr testified that the technicians work ten-hour shifts, twenty-four hours a day, seven days a week, 365 days a year. The technicians have no official lunch break, are on-duty and paid during any lunch break they manage to take, and are not allowed to leave the facility. Additionally, these employees are not

_____

[5]The Supreme Court in National Labor Relations Board v. J. Weingarten, Inc., 420 U.S. 251 (1975), affirmed the right of a union employee to have a union representative present at an investigatory interview which the employee reasonably believed might result in disciplinary action. Congress enacted 5 U.S.C. § 7114(a)(2)(B) in response to Weingarten, intending to make the Weingarten right applicable to federal employees. See American Fed. of Gov't Employees, Local 1941 v. Federal Labor Relations Auth., 837 F.2d 495, 499-500 (D.C. Cir. 1988).

allowed to take their lunch at the end of their tour of duty and leave early. On the other hand, administrative employees such as plaintiff receive a one-half hour lunch break fixed between 11:00 a.m. and 1:00 p.m., and plaintiff knew this prior to his reassignment to the St. Louis facility. Plaintiff admitted that he was told these were the rules concerning his lunch period after he came to St. Louis, twice by Barr and once by Knoche. As a result, plaintiff knew that he did not have the right to take his lunch break at the end of the day, leave the agency's facility early, or go to the TWA offices on August 28, 2001.

     3. <u>Work Schedules</u>.

Barr also testified that it was the agency's Regional policy that no administrative support personnel were allowed a work schedule of eight ten-hour work days per pay period. For this reason Barr denied plaintiff's request to work eight ten-hour days per pay period because plaintiff, a Computer Specialist, was classified as administrative support. Plaintiff was told that did have the option to work a 5/4/9 schedule, which involved working nine-hour days for five days in one week, and four days the following week, and then taking the second Friday of the two-week period off.

     4. <u>Religious Leave</u>.

Plaintiff requested and was granted religious leave for April 17, 2003 to observe the Jewish Passover holiday. Plaintiff testified that on the afternoon of April 16, 2003, Barr told plaintiff he needed to stay to complete work that plaintiff was doing on a secretary's computer. Barr testified that he asked plaintiff if he could stay to complete the installation of an e-mail program on a computer, but denied telling plaintiff that he had to stay until the work was finished. Barr also denied that plaintiff told him he had to get home to prepare for a religious holiday, and testified that had if he had known of the conflict, he would not have made the request. Barr testified that he had never

denied any request for observance of a religious holiday. Plaintiff missed part of his family's Passover religious observance because he worked until 6:55 p.m. on April 16, 2003, to finish the work.

5. Teleconferences.

Plaintiff testified that the agency had twice monthly meetings by teleconference, and that when he worked for the agency's Kansas City Regional Office, he conducted these conferences. Plaintiff further testified that he did not participate in these conferences after transferring to St. Louis because Barr did not have him added to the list of participants as promised. Plaintiff stated that he did not call into the conferences on his own because he did not know exactly when they were to take place, and he did not feel comfortable participating in a meeting to which he was not formally invited. Plaintiff also testified that no one from the St. Louis facility, including Barr, was on the participant list. Barr testified that he had never had any discussions about plaintiff being excluded from these teleconferences, nor had plaintiff ever requested that Barr place him on the list of participants.

6. Telephone System Training.

Before he transferred to St. Louis, plaintiff was informed by Barr that he would be given training on the PBX Telephone System. Shortly after his arrival, however, Barr informed plaintiff that he would not be working on the system. Barr testified that his original intention was to have plaintiff trained on the PBX Telephone System so that he could maintain the new system when the unit changed locations in April 2002. Barr testified that he changed his mind when a 2101 Specialist union representative informed him that a grievance would be filed if he turned over the work to plaintiff, as the 2102 Specialists wished to retain control over the PBX Telephone System.

7. <u>Volunteer Ombudsman Request</u>.

Plaintiff made a request to Barr to serve as a volunteer ombudsman for the Department of Defense on November 9, 2001, and the request was denied. Plaintiff testified that although his request was denied, other employees were allowed to participate in another volunteer program called Youth Friends. After receiving plaintiff's request, Barr testified that he contacted the agency's regional office because he was unfamiliar with the program. Barr stated that he denied the request because plaintiff already received 120 hours a year for military leave, and his request came at a busy time when the unit was moving to a new facility. Barr did not supervise any of the employees that plaintiff cited as participating in the Youth Friends Program. Barr did not have any other employees under his supervision who had ever requested official time to perform volunteer work.

8. <u>Warnings about Plaintiff</u>.

Plaintiff alleges that Barr warned plaintiff's co-workers to "watch out" for him because he was "legalistic." Plaintiff testified that he had never heard management refer to him as legalistic, nor could he identify any co-worker that heard Barr make such statements. Barr testified that he never warned any of his employees about plaintiff. Barr also never overheard any employee referring to plaintiff in this manner.

9. <u>Travel Route Issue</u>.

Plaintiff was contacted by Denise Schaefer, the Administrative Officer for the agency's Gateway Systems Management Office, to discuss travel vouchers on March 27, 2002. St. Louis Field Office Facility Manager Jane Knoche requested that Schaefer provide local travel voucher training to plaintiff. Schaefer testified that she assumed she was directed to provide travel voucher training to plaintiff because he was new to the St. Louis facility. In preparation for the meeting, Schaefer used

the Map Quest Internet computer program to determine plaintiff's local route between home and work, which showed that plaintiff could claim ten miles for the trip rather than the nine miles plaintiff had claimed. Schaefer then used the result to show plaintiff how to complete the proper travel voucher form. Schaefer informed plaintiff that he should claim the actual mileage traveled when completing his voucher, regardless of what Map Quest showed. Schaefer did not know that plaintiff had been involved in any prior EEO activity when she conducted the training, and did not learn of plaintiff's prior EEO activity until approximately one month before the March 2004 EEOC hearing, when plaintiff informed her of it.

      10. <u>Work Location in Computer Room</u>.

      Plaintiff was assigned to work in the computer equipment room after his unit moved to its new location in St. Charles, and he complained about of a lack of heat, noise and a malfunctioning electromagnetic door lock. Although plaintiff claimed that the two other individuals he shared the room with had other spaces they could occupy, he also admitted he had never directly asked these employees if they actually had other space in which to work. Plaintiff asserts that there was other space in the new facility he could have used as a work space, including a storage room and Barr's former office. Plaintiff made a request to move on May 16, 2002, but Barr denied the request on June 12, 2002.

      Barr testified that when he made office assignments, he was not aware of any problems with the computer room, and he testified that the room was specifically designed for the computer equipment. Barr testified that plaintiff was assigned to this room because it was the "Local Area Network IRM" room where other Air Traffic employees who performed similar tasks as plaintiff were also assigned. The other employees assigned to the computer room did not have prior EEO activity.

Barr testified that he did not receive any direct complaints from plaintiff about the room's temperature, but when he heard that plaintiff had made complaints, he had them investigated. Barr testified he went to the computer room and found that it maintains a constant 75-degree temperature. Barr agreed with plaintiff that the room does not contain heating coils, but testified that the room heated up from the computer equipment, and from the surrounding areas. After learning that plaintiff had concerns about the heat, Barr testified that he planned to augment the heat in the room with an auxiliary heater in cold weather. Barr testified that the other two employees who were permanently assigned to the same work space as plaintiff did not have other work space, and had not complained about the temperature of the room.

Barr testified that he had an Industrial Hygienist and Environmental Technician check the ventilation of the space, and it was found to be more than adequate. Barr also had the construction crew of the new building change the lock mechanism on the security door, although the replacement was delayed a month because parts had to be ordered. Barr testified he had a noise sampling taken throughout the entire facility, including plaintiff's work space, and this study concluded that the noise within plaintiff's work area was within the acceptable level prescribed by the Occupational Safety and Health Administration. Barr testified there were other work rooms in the new building where other employees were assigned to work which had more computer equipment than the room in which plaintiff worked.

Barr testified that the reason he did not move plaintiff to his former office was that Barr was told to make no further office changes, because a reorganization was pending and additional personnel would be reassigned to the facility. Barr further stated that the storage room plaintiff asked

to move into was not designed to be an office, and although a duct ran to the room, there was no thermostat and therefore no way to regulate the flow of heat or air conditioning into the room.

11. <u>Government Vehicle Damage</u>.

Plaintiff reported some minor problems with a government vehicle to supervisor Jane Knoche in early June 2002. Plaintiff was given the assignment to take the van in for repairs but said that Knoche told him, "Don't break the van again." Hearing Transcript at 264. After returning to work from vacation Knoche needed to use the van for business, and discovered that several features were broken. Knoche's secretary, Candy Hoffmann, told her that plaintiff had been the last person to use the van, and she questioned him about the problems, expressing her frustration that no steps had been taken to repair it. Knoche had Hoffman and plaintiff take the van in for repairs. Knoche had no recollection of telling plaintiff, "Don't break the van again," but testified that, if she did make the statement, it was done in a joking manner.

12. <u>Denial of Cash Award/Time Off Award</u>.

Plaintiff testified that he was denied a cash award and/or a time off award for work performed during 2001 and 2002 at the new facility in St. Charles. Plaintiff stated that he was either the only individual or one of very few who did not receive some type of award. Barr testified that he recommended cash awards for Systems Specialist William Eichelberger and Communications Specialist Steven Nichols based on their specialized areas of work at the new facility for more than one year prior to the actual move. Barr also recommended a number of employees for time off awards to recognize their efforts in transitioning to the new facility. Barr stated that he did not recommend plaintiff for any award because his contributions did not warrant such a recommendation.

13. Denial of Superior Contribution Increases Award.

According to Barr, employee applications for Superior Contribution Increase Awards were due on October 1, 2002, and he did not receive an application from plaintiff until October 29, 2002. Barr explained that these applications could include not only self-assessments, but also input from peers and customers; these applications formed the basis for the supervisor to determine if the employee was qualified for an award. Barr announced at the August 2002 staff meeting that all applications were due by October 1, 2002, as he was required to send a list of selectees to the Gateway Systems Management Office to be forwarded to the Regional Office in Kansas City. The employees whose names Barr submitted were selected on October 18, 2002, eleven days before plaintiff provided Barr with his application. Barr accepted plaintiff's application on October 29, 2002, but told him the application was untimely and that the selections had already been made. Barr testified that plaintiff was the only employee who submitted an untimely application.

14. Denial of Labor Distribution Reporting Award.

Barr did not nominate any of his employees for either a cash award or time off award for any work performed with the Labor Distribution Reporting program ("LDR"). Barr stated that the two employees that plaintiff named as receiving an LDR award, Pam Neitzert and Ken Eaker, were not under his supervision, and that Barr's unit had minimal involvement in this program. Barr did not know that awards were being given out for the LDR program, nor was he asked to nominate anyone for them.

15. Non-Selection for Temporary TRACON-75 SSC Manager Position.

Barr testified that the requirements to serve temporarily in Barr's his position as TRACON-75 SSC Manager, were provided in each vacancy announcement regarding the position, and plaintiff did

17

not meet these requirements. Barr explained that the basic qualifications for his position required that the employee be a FV-2101 Airway Transportation System Specialist with 52 weeks at the I-Band pay level. Only four 2101 Specialists met the basic requirements to serve in Barr's position: David Dixon, James Turner, William Eichelberger and Charles Breece. The rationale behind the requirement that applicants be a FV-2101 Airway Transportation System Specialist with 52 weeks at the I-Band pay level was that the Acting Manager had to understand all of the operational procedures to work with the Air Traffic personnel, including handling radar or other equipment outages.

16. <u>Safety Shoes</u>.

Barr offered safety shoes to plaintiff in 2002 although Computer Specialists do not usually have a need for this type of shoe. Barr did so because he thought he would have plenty of funds in the budget for the purchase. However, Barr learned after he made the offer to plaintiff that he did not have money in the budget to make the purchase. Safety shoes are generally worn by technicians in the Airway Facilities workforce. The safety shoes generally have steel toes to protect the technicians' feet when they climb radar towers, work on equipment out in the field and inside buildings, crawl and climb in any number of apparatus while working on equipment, and take equipment weighing thousand of pounds off of fork lifts. Barr testified that plaintiff never asked for safety shoes, but he stated at the EEO hearing that if plaintiff wanted a pair, the shoes could be purchased out of the 2004 operational budget.[6]

17. <u>Cessation of Work at Other Units</u>.

After transferring to St. Louis, in addition to his assigned duties of providing computer support services at TRACON-75 SSC, plaintiff provided computer support services at three other

---

[6]The Court assumes that plaintiff received safety shoes in 2004, as the complaint alleges that the shoes were denied to plaintiff until July 2004.

sites, the FAA offices of St. Louis NAVCOM, St. Louis RADAR and the St. Louis Facility Manager. In June 2003, these locations began to use two other computer specialists instead of plaintiff. After her return to St. Louis in July 2003 and based on a strong recommendation from a managerial colleague, Knoche recommended to the employees in her office that they no longer seek computer help from plaintiff. Knoche made this decision because there were computer specialists located only seven miles from these three sites, whereas TRACON-75 SSC, where plaintiff worked, was twenty-five miles away.

## Discussion

In the absence of direct proof of discrimination, a Title VII plaintiff can prove his case under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). Under this framework, a plaintiff must establish a prima facie case of discrimination by a preponderance of the evidence. To establish a prima facie case of retaliation under Title VII, plaintiff must show that (1) he engaged in a protected activity; (2) a reasonable employee would have found the challenged retaliatory action materially adverse; and (3) a causal connection exists between the protected activity and the materially adverse action. Higgins v. Gonzales, __ F.3d __, No. 06-3582, slip op. at 15 (8th Cir. Mar. 20, 2007) (citing Burlington Northern & Santa Fe Ry. Co. v. White, __ U.S. __, 126 S. Ct. 2405, 2415 (2006)).[7]

---

[7]The Eighth Circuit has explained the recent broadening of the prima facie case for retaliation discrimination promulgated by the Supreme Court in Burlington Northern as follows:

In Burlington Northern, the Supreme Court announced a different standard for determining whether a plaintiff has established a retaliation prima facie case. Because "[t]he scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm," a plaintiff need not show an adverse employment action related to the terms and conditions of employment. Id. at 2414. Instead, "the challenged action [must be] materially adverse, which in th[e] context [of a retaliation claim] means that it well might have

A disparate treatment case based on religion requires a plaintiff to show that he was treated less favorably than others because of his religious beliefs. Mann v. Frank, 7 F.3d 1365, 1370 (8th Cir. 1993) (citing International Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977)). In a disparate treatment case, the plaintiff must prove that he is a member of a protected class and must compare his treatment to that of a similarly situated member of a non-protected class. Id. (citing Hervey v. City of Little Rock, 787 F.2d 1223, 1231 (8th Cir. 1986)). The elements of a prima facie case of disparate treatment because of religion are: (1) the plaintiff was a member of a protected class because of the plaintiff's religious affiliation or beliefs; (2) the employee informed the employer of his religious beliefs; (3) the plaintiff was qualified for the position; (4) despite the plaintiff's qualifications, the plaintiff was fired or suffered an adverse employment action; and (5) similarly situated employees outside of the plaintiff's protected class were treated differently or there is other evidence giving rise to an inference of discrimination. Vetter v. Farmland Indus., Inc., 884 F. Supp. 1287, 1302 (N.D. Iowa 1995).

---

dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 2415 (citation and internal quotation marks omitted). The standard is thus objective, requiring us to consider whether a reasonable employee in the plaintiff's position might have been dissuaded from making a discrimination claim because of the employer's retaliatory actions. Id. at 2412-13. The Court explained the action against the plaintiff must still be "materially adverse" noting: "[w]e speak of material adversity because we believe it is important to separate significant from trivial harms," id. at 2415, and "Title VII . . . does not set forth 'a general civility code for the American workplace.'" Id. (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)). As such, certain behavior continues to be non-actionable under the retaliation provision such as "petty slights or minor annoyances that often take place at work and that all employees experience," "personality conflicts at work that generate antipathy," and "snubbing by supervisors and co-workers." Burlington N., 126 S. Ct. at 2415."

Higgins, No. 06-2556, slip op. at 15-16.

To show that he suffered an adverse employment action, plaintiff must establish a tangible change in duties or working conditions that constitutes a material employment disadvantage.  See Cossette v. Minnesota Power & Light, 188 F.3d 964, 972 (8th Cir. 1999).  Mere inconvenience without any decrease in title, salary, or benefits is insufficient to show an adverse employment action. Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994).

At the second step of the McDonnell Douglas analysis, after the plaintiff has established a prima facie case, the defendant must offer evidence of a reason other than illegal discrimination for its action. The employer's burden at step two of the analysis is one of production, not proof.  Krenik v. County of Le Sueur, 47 F.3d 953, 958 (8th Cir. 1995); see Britton v. City of Poplar Bluff, Mo., 244 F.3d 994 (8th Cir. 2001) (city's articulation of legitimate, non-discriminatory basis for terminating plaintiff's employment, its belief that she was responsible for the theft of electricity at her home, was adequate to meet its burden, despite plaintiff's challenge to the allegation).

When the prima facie case has been successfully rebutted, the presumption of discrimination disappears.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 510-11 (1993); Rothmeier v. Investment Advisers, Inc., 85 F.3d 1328, 1334 (8th Cir. 1996) (age discrimination case).  The burden then shifts back to the plaintiff to present evidence sufficient to support two findings.  First, the plaintiff must present evidence which creates a fact issue as to whether the employer's proffered reasons are mere pretext for illegal discrimination.  Second, he must present evidence which creates a reasonable inference that the adverse employment decision was an act of intentional discrimination. Rothmeier, 85 F.3d at 1336-37; see Carter v. St. Louis University, 167 F.3d 398, 401 (8th Cir. 1999).

1.  Exhaustion of Administrative Remedies.

Defendant first argues that the Court lacks subject matter jurisdiction over items 6, 11, 12, 14, and 27 of plaintiff's complaint because plaintiff failed to exhaust his administrative remedies as to these claims.[8]  Defendant asserts that 29 C.F.R. § 1614.105(a)(1) requires a federal employee to consult with an Equal Employment Opportunity (EEO) counselor within forty-five days of either the alleged act of discrimination or the effective date of a personnel action.  Defendant alleges that plaintiff did not contact an EEO counselor within forty-five days of the following alleged acts:  Item 6 (denial of spot leave); and Item 12 (delay of five months in reimbursing plaintiff for travel voucher, Reimbursement for the first week of October 2001).  Defendant alleges that plaintiff did not contact an EEO counselor regarding these allegations until December 13, 2001, well past the forty-five day deadline.  Defendant states that plaintiff never contacted an EEO counselor regarding Item 14 (Non-Selection for Temporary Position).  Finally, defendant states that plaintiff did not exhaust his administrative remedies as to items 11 and 27 because he withdrew these allegations during his EEOC hearing.  Plaintiff does not address defendant's exhaustion arguments in his response memorandum.

As a federal employee, plaintiff is subject to the federal employment provisions of Title VII, which contemplate that each federal agency will establish procedures for the processing of discrimination complaints.  See 42 U.S.C. § 2000e-16(b).  EEOC regulations require that employees of federal agencies who believe they have been discriminated against must consult an EEO counselor prior to filing a complaint in order to try to informally resolve the matter.  See 29 C.F.R. § 1614.105(a).  Such employees must initiate contact with a counselor within forty-five days of the

---

[8]These claims are also labeled in the complaint as (f), (k), (l), (n) and (aa) .  See Complaint, pp. 2-3, 7, 9, 10 and 16.

matter alleged to be discriminatory, or in the case of a personnel action, within forty-five days of the effective date of the action. See 29 C.F.R. § 1614.105(a)(1). Contrary to defendant's assertion, however, this administrative prerequisite to a court action is not jurisdictional, and instead is interpreted as a statute of limitations. See Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393-94 (1982); Briley v. Carlin, 172 F.3d 567, 570 (8th Cir. 1999). Accordingly, these claims are not subject to dismissal for lack of subject matter jurisdiction. See also Banks v. National Personnel Records Center, 2006 WL 1663491, *3 n.3 (E.D. Mo. June 15, 2006) (noting that the government incorrectly asserted a lack of subject matter jurisdiction over the complaint because the plaintiff failed to exhaust administrative remedies).

The Court finds that plaintiff did not comply with EEOC regulations and timely exhaust all administrative remedies as to complaint item 6 (denial of spot leave), complaint item 12 (local travel reimbursement), and complaint item 14 (non-selection for temporary position of Manager, Program Support Unit). Because plaintiff did not comply with 29 C.F.R. § 1614.105(a) and contact an EEO counselor within forty-five days of the occurrences, these claims must be dismissed for failure to exhaust administrative remedies. Complaint Items 11 (denial of compensation for work travel in June 2001) and 27 (denial for compensation for work travel in July 2003) must be dismissed in accordance with 29 C.F.R. § 1614.107(a)(2) because plaintiff elected to withdraw these issues from consideration at the EEOC hearing held on March 1 and 2, 2004.

2. Fourteen-Day Suspension in February 2002.

In complaint Item 1 plaintiff alleges that when he was suspended from work by the FAA by letter dated January 30, 2002, he was denied due process of law because the FAA's Report of Investigation file, which he requested, was not provided to him until after the suspension occurred.

23

Plaintiff alleges that this withholding of information was based on retaliation and discrimination. Plaintiff alleges that defendant did not "provide the plaintiff the ability to defend himself." Complaint at 5, ¶ 8.a. Plaintiff alleges that this constitutes a denial of due process and was retaliation and discrimination. In complaint Items 2 through 5, plaintiff alleges that the suspension itself was unfounded and based on inaccurate information, was based on retaliation and discrimination, and created a hostile work environment. Plaintiff also alleges in complaint item 16 that management conducted an unfair investigation against him in compiling the Report of Investigation.

        a. <u>Retaliation</u>.

Defendant argues that plaintiff cannot establish a prima facie case of retaliation based on his fourteen-day suspension. Although defendant acknowledges that plaintiff participated in protected activities and was subject to an adverse employment action, it argues that plaintiff cannot establish a causal link between the two. Defendant contends that plaintiff was suspended not as a result of retaliation, but because he violated FAA policies when he used his position within the agency to gain access to TWA officials to discuss non-FAA personal business during work hours.

In response, plaintiff does not deny that he used his FAA credentials to gain access to TWA managers for his own personal business. Instead, plaintiff offers two main arguments. First, plaintiff argues that the agency improperly used information from his employment with the agency in Kansas City as set forth in the Settlement Agreement as the basis for the fourteen-day suspension. Plaintiff argues that in using this information, defendant breached the Settlement Agreement reached in Kansas City in 2000. Plaintiff argues that issues concerning the breach of the settlement agreement should be determined by the trier of fact.

Second, plaintiff focuses on the agency's determination that he was absent without leave from his position when he went to the TWA offices on August 28, 2001. Plaintiff argues that he was actually on his lunch break, as he was free to take lunch at any time during the day when he was able. Plaintiff complains that the agency told him that his lunch had to be taken between 11:00 a.m. and 1:00 p.m. only after the TWA incident, and argues that he was the only employee in his section with a set meal break, as all of the other employees had "floating" meal breaks. Plaintiff contends that until December 13, 2001, management gave him the discretion to use floating meal breaks. To support this contention, plaintiff lists several dates where he worked through normal lunch times and took a later meal break. Plaintiff argues that although he regularly took floating meal breaks, the suspension letter dated December 13, 2001 stated that plaintiff he had been absent without leave and had taken unauthorized leave from the work site during duty hours. Plaintiff argues that the agency's action of changing his meal breaks without notice and then charging him with being absent without leave is evidence of retaliation. In essence, plaintiff attempts to show that he received disparate treatment than other employees concerning his meal breaks, and as a result an issue of fact exists concerning whether the suspension was an act of retaliation.

Defendant replies that plaintiff has failed to exhaust his administrative remedies with respect to any claim concerning breach of the Settlement Agreement, because he has not complied with (1) 29 C.F.R. § 1614.105(a)(1), which requires that a person seeking redress under Title VII for discrimination by a federal agency bring his or her complaint to the attention of an EEO counselor within forty-five days of the alleged discriminatory action, and (2) 29 C.F.R. § 1614.504, which mandates that if a complainant believes an agency has failed to comply with the terms of a settlement agreement, the complainant shall notify the EEO Director in writing within thirty days of the date the

complainant knew or should have known of the alleged noncompliance. Defendant further argues that plaintiff received the suspension for his behavior in meeting with TWA managers on August 28, 2001, and the Settlement Agreement only applied to plaintiff's actions on and before December 21, 2000, and was not intended to constrain the agency from its ability to discipline plaintiff in the future if he violated rules and regulations.

With respect to the issue of a floating lunch break, defendant cites Supervisor Barr's EEOC hearing testimony that on two occasions after plaintiff began working in St. Louis, he was informed he had to take his lunch between 11:00 a.m. and 1:00 p.m., and could not leave thirty minutes early at the end of the work day for his lunch break. Defendant also states that plaintiff has conceded that he had been informed by both of his supervisors, Jane Knoche and David Barr, regarding the time for his lunch breaks. Defendant states that this was a regional policy for all administrative staff, so plaintiff was not being treated differently than any other administrative employee. Barr testified that the policy was different with respect to the 2101 Specialists, who have no set lunch breaks and take floating lunch breaks when they can, because they must be available at all times to respond to issues concerning the National Air Space equipment for which they are responsible.

As a threshold matter, plaintiff cannot assert an alleged breach of the Settlement Agreement as a defense to the summary judgment motion. If plaintiff believed that any breach of the Settlement Agreement occurred, he was required to notify the Director of Civil Rights in writing within thirty calendar days of the alleged violation and request specific implementation of its terms, pursuant to 29 C.F.R. Part 1614, Section 504. The alleged violation occurred, at the latest, when the fourteen-day suspension became effective in February 2002. It is uncontroverted that plaintiff did not notify the Director of Civil Rights of any claimed breach. Further, defendant is correct that the Settlement

Agreement only refers to conduct which occurred on and prior to the date of its execution, and cannot protect plaintiff from discipline arising out of his subsequent actions. Plaintiff's attempt to raise a potential breach of the Settlement Agreement as an issue of fact precluding summary judgment in this action fails, and the Court will not discuss it further.

It is undisputed in this case that plaintiff engaged in statutorily protected activity by participating in previous EEO activities, and that he suffered an adverse employment action when he was suspended.[9] The third element of the case, a causal connection between the two, is in dispute. In retaliation case, a causal connection is a showing that the employer's "retaliatory motive played a part in the adverse employment action." Kipp v. Missouri Highway & Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002). Evidence that gives rise to an inference of retaliatory motive on the part of the employer is sufficient to establish a causal connection. Id. Moreover, "evidence that gives rise to an inference of such a motive is not only sufficient to establish a causal link but is also necessary." Id.

In this case, plaintiff offers no direct evidence of a causal connection. Plaintiff argues that all of defendant's disciplinary actions against him arising from the TWA incident are based on retaliation, but the argument is not supported by evidence as opposed to mere conjecture. With respect to temporal proximity, the eight-month gap between the protected activity and the discipline in this case is too great to establish a prima facie case of a causal relationship. "The cases that accept mere

_____

[9]In this case, because it is undisputed in the parties' briefs that plaintiff's suspension constituted an "adverse employment action," the Court continues to refer to the suspension as such despite the change in the retaliation prima facie case announced in Burlington Northern. Plaintiff's suspension meets the stricter standard in effect prior to Burlington Northern, which required an adverse employment action to establish the second step of the prima facie case, see, e.g., Singletary v. Missouri Dep't of Corrections, 423 F.3d 886, 892 (8th Cir. 2002), rather than an action a reasonable employee would find materially adverse.

temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima face case uniformly hold that the temporal proximity must be very close." Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (per curiam) (internal quotation marks and cited case omitted). The Eighth Circuit has generally refused to find evidence of causation where the adverse employment action follows the protected activity by six months or more. See, e.g., Sowell v. Alumina Ceramics, Inc., 251 F.3d 678, 685 (8th Cir. 2001) (seven-month time lapse between protected activity and the alleged retaliatory act, without more, was "too long for the incidents to be temporally--and therefore causally--related"); Feltmann v. Sieben, 108 F.3d 970, 977 (8th Cir. 1997) (plaintiff fired six months after the protected activity; without more, temporal proximity was insufficient to show causal link), cert. denied, 523 U.S. 1041 (1998). The Court also notes that plaintiff's prior EEO activity took place in a different FAA regional office with different supervisory personnel, which lessens any inference of retaliation. There is also no evidence of prior discipline of plaintiff in the St. Louis office before the suspension occurred. Cf. Bassett v. City of Minneapolis, 211 F.3d 1097, 1104 n.12 (8th Cir. 2000) (a causal connection existed sufficient to create an inference of retaliation where, in addition to a two-month temporal proximity, a pattern of increasing levels of discipline existed).

The Court concludes that plaintiff has failed to establish a prima facie case of retaliation discrimination because he cannot establish that a causal connection exists between his prior protected activity and the fourteen-day suspension. Plaintiff articulates only the existence of his prior EEO complaint to establish the causal connection, and this is insufficient.

Moreover, even if the Court were to assume that plaintiff had established a prima facie case, the defendant has successfully rebutted it with its nondiscriminatory reason for the suspension,

plaintiff's use of his FAA credentials to gain a meeting with TWA managers on personal business, in violation of FAA policy. Plaintiff has not offered any evidence tending to show that defendant's articulated nondiscriminatory reason is a mere pretext for illegal discrimination, and has not presented evidence which creates a reasonable inference that the adverse employment decision was an act of intentional discrimination. See Rothmeier, 85 F.3d at 1336-37. It is clear to the Court that plaintiff was suspended as a result of his own misconduct. Defendant is therefore entitled to summary judgment on plaintiff's retaliation claim based on the fourteen-day suspension.[10]

> b. Religious Discrimination.

Plaintiff also alleges that the fourteen-day suspension was imposed as a result of discrimination against him because of his Jewish religion. The elements of a prima facie case of disparate treatment because of religion are: (1) the plaintiff was a member of a protected class because of the plaintiff's religious affiliation or beliefs; (2) the employee informed the employer of his religious beliefs; (3) the plaintiff was qualified for the position; (4) despite the plaintiff's qualifications, the plaintiff was fired or suffered an adverse employment action; and (5) similarly situated employees outside of the plaintiff's protected class were treated differently or there is other evidence giving rise to an inference of discrimination. Vetter v. Farmland Indus., Inc., 884 F. Supp. 1287, 1302 (N.D. Iowa 1995).

---

[10]The Court also rejects plaintiff's complaint item 19, which asserts that defendant denied plaintiff "appropriate official travel time between work locations on August 28, 2001" and then suspended him. Plaintiff never raised this claim with an EEO counselor or in proceedings before the EEOC and cannot raise it for the first time in this action. Further, there is no evidentiary support in the record for the contention that plaintiff was directed by the FAA to travel between work locations on August 28, 2001. Rather, the record shows that plaintiff left his duty station, went to TWA's offices on personal business, and either before or after going to TWA, stopped by the old FAA tower on his way back to work and picked up "stuff" that needed to be delivered back to the duty station location. See Gov't Ex. I.

Defendant argues that plaintiff cannot establish a prima facie case of discrimination. Although defendant concedes that plaintiff is a member of a protected religious class and that the fourteen-day suspension was an adverse personnel action, defendant denies that there is any evidence similarly-situated employees outside plaintiff's protected class who were treated more favorably under similar circumstances, as required by Lynn v. Deaconess Medical Center, 160 F.3d 484, 487 (8th Cir. 1998).

There is no dispute as to the first four elements of the prima facie case. Under the fifth element, plaintiff bears the burden to proffer "specific, tangible evidence" that employees who were "similarly situated in all respects" to him received different treatment from management. Rose-Maston v. NME Hosp., Inc., 133 F.3d 1104, 1109 n.4 (8th Cir. 1998) (first quote); Gilmore v. AT & T, 319 F.3d 1042, 1046 (8th Cir.) (second quote), cert. denied, 540 U.S. 955 (2003). The Court finds that plaintiff has not met his burden to establish the fifth element of the prima facie case. Although plaintiff presents evidence that he was the only employee in his section who had a set meal break while the other employees had floating meal breaks, it is undisputed that the other employees were 2101 Specialists, classified as technicians, who did not have an official meal break (i.e., they had a "floating" meal break) because of the demanding nature of their jobs. It is undisputed that plaintiff was a Computer Specialist with different job duties than the 2101 Specialists, was classified as an administrative employee, and that administrative employees were required to take their meal breaks between 11:00 a.m. and 1:00 p.m. Plaintiff is therefore not similarly situated to the other employees. In addition, plaintiff admitted he was told at least twice since he came to the St. Louis office that he did not have a floating meal break and must take his meal break between 11:00 a.m. and 1:00 p.m.

The facts asserted by plaintiff concerning the issue of meal breaks therefore does not raise an issue of fact as to different treatment based on religion.[11]

Plaintiff presents no other evidence that any similarly-situated non-Jewish employee received different treatment from management. Plaintiff's supervisor David Barr avers that he has never had another employee engage in similar conduct for which plaintiff was suspended, and has never suspended another employee.

Even if the Court were to assume that plaintiff had established a prima facie case, an assumption that is not warranted, defendant has successfully rebutted it with its nondiscriminatory reason for the suspension--plaintiff's use of his FAA credentials to gain a meeting with TWA managers on personal business, in violation of FAA policy. Plaintiff has not presented any evidence that TWA's reason for imposing the suspension was a pretext for illegal discrimination, or which creates an inference that religious discrimination was the real reason for the suspension. Again,

---

[11]Plaintiff places great emphasis on a mention in the December 13, 2001 letter, which proposed the fourteen-day suspension, that plaintiff had been counseled and directed to complete his lunch break by 1:00 p.m. during the preceding twelve-month period while he was assigned to the Kansas City Regional Office. Plaintiff contends that the handwritten note of his previous supervisor in Kansas City, Patricia Hickman, which allegedly memorializes her conversation with plaintiff concerning when he could take his lunch breaks, was dated on a Sunday, when he was not at work, and therefore must be false and an act of retaliation. This issue is a red herring, because plaintiff does not dispute Barr's statement in the letter that plaintiff had been counseled, on at least two occasions since he transferred to St. Louis, that he must complete his scheduled lunch break by 1:00 p.m. and could not make the last thirty minutes of the workday a lunch period, and plaintiff was also told by Jane Knoche in June 2001 that he could not take his lunch break at the end of the day and leave early. See Gov't Ex. I at 2. Plaintiff is also incorrect that he was suspended based on Hickman's note. Rather, plaintiff was disciplined as a direct result of his actions in going to the TWA offices on August 28, 2001. The letter's references to the Hickman note and Barr's counseling of plaintiff can only be construed as explaining to plaintiff why discipline was being proposed for an unauthorized absence from the work site during duty hours--because plaintiff had been previously informed that he could not take a lunch break after 1:00 p.m., and he left his work station at approximately 3:15 p.m. when he went to TWA's offices on August 28, 2001. See Gov't Ex. K.

defendant's own misconduct was the direct cause of his suspension. Defendant's motion for summary judgment should therefore be granted on this aspect of plaintiff's case.[12]

        c. <u>Hostile Work Environment</u>.

Plaintiff also alleges that the suspension itself was unfounded and based on inaccurate information, and created a hostile work environment. With respect to the allegation that the suspension was unfounded, "[f]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions . . . . Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior." <u>Harvey v. Anheuser-Busch, Inc.</u>, 38 F.3d 968, 973 (8th Cir. 1994) (quoted case omitted). It is not material whether the FAA's findings were correct concerning plaintiff's suspension, because there is no evidence the reasons given for suspending plaintiff were a disguise for an illegal discriminatory motive. <u>See id.</u> at 900. The Court finds there is no genuine issue of fact concerning whether the FAA honestly believed plaintiff improperly used his FAA credentials to obtain a meeting with TWA management, was absent without leave, and had an unauthorized absence from his worksite during duty hours. <u>See</u>, <u>e.g.</u>, <u>Scroggins v. University of Minn.</u>, 221 F.3d 1042, 1045 (8th Cir. 2000) (explaining that relevant inquiry is whether employer believed employee was guilty of conduct justifying discharge); <u>Euerle-Wehle v. United Parcel Service, Inc.</u>, 181 F.3d 898 (8th Cir. 1999) (same).

---

[12]Defendant's motion for summary judgment should also be granted as to complaint item 7, that management changed plaintiff's floating meal breaks without notice on December 13, 2001 and then disciplined him with the fourteen-day suspension for being absent without leave. This claim is entirely without evidentiary support, as plaintiff conceded that he had been instructed three times since his transfer to St. Louis that he could not take floating meal breaks and had to have his meal break between 11:00 a.m. and 1:00 p.m.

With respect to the issue of a hostile work environment, "A hostile environment exists when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Palesch v. Missouri Comm'n on Human Rights, 233 F.3d 560, 566 (8th Cir. 2000) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotations and further citation omitted)). Hostile work environments created by supervisors or coworkers have the following elements in common: (1) the plaintiff belongs to a protected group; (2) the plaintiff was subject to unwelcome harassment; (3) a causal nexus exists between the harassment and the plaintiff's protected group status; and (4) the harassment affected a term, condition, or privilege of employment. Al-Zubaidy v. TEK Indus., Inc., 406 F.3d 1030, 1038 (8th Cir. 2005).

To constitute a hostile work environment, the harassment must be "'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Harris, 510 U.S. at 21 (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)). "To be actionable, harassment must be both objectively and subjectively offensive, such that a reasonable person would consider it to be hostile or abusive, and courts make this determination 'by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Breeding v. Arthur J. Gallagher and Co., 164 F.3d 1151, 1158 (8th Cir. 1999) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)); see Stuart v. General Motors Corp., 217 F.3d 621, 630 (8th Cir. 2000).

The Court finds that plaintiff has not alleged any facts which would be sufficient to raise a genuine issue as to whether he was subjected to a hostile work environment by virtue of the fourteen-day suspension. Defendant is therefore entitled to summary judgment on this claim.

d. Due Process.

Plaintiff also alleges that his suspension occurred in violation of his due process rights, because he requested the FAA's Report of Investigation ("ROI") file into the TWA incident, but it was not provided to him until after the suspension occurred. Plaintiff alleges that the withholding of information constituted retaliation and discrimination. Plaintiff alleges that defendant did not "provide the plaintiff the ability defend himself," presumably by not providing the ROI. Complaint at 5, ¶ 8.a. Plaintiff also alleges that defendant retaliated against him by forcing him into a Weingarten meeting "unprepared without any notice." Complaint at 6.

In the public employment context, "due process" requires that the government employer provide: 1) oral or written notice of the charges against the employee, 2) an explanation of the employer's evidence, and 3) an opportunity for the employee to present his or her side of the story before his or her job is terminated. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985) (citation omitted).[13]

In this case, plaintiff appears to challenge either the first or second element, as he contends that he should have been provided with the FAA Security Division's ROI before the discipline was imposed. Plaintiff fails to allege a due process violation. The ROI, Gov't Ex. H, was the internal

_____

[13]It is not clear to the Court that plaintiff has a due process right in connection with a fourteen-day suspension. See, e.g., 5 U.S.C. §§ 7512, 7513 (providing certain due process protections for removals, suspension for more than fourteen days, reductions in grade, reductions in pay, and furloughs of 30 days or less). For purposes of this summary judgment, however, the Court will assume that plaintiff can assert a due process claim in connection with his suspension.

investigation of the TWA incident. The ROI was dated October 25, 2001, several months before plaintiff's suspension was ever proposed. Plaintiff had not yet been charged with any misconduct, so he was not yet a party to any suspension action. Therefore, no due process right attached to plaintiff at that time and there can be no ex parte violation. Cf. Harold v. Barnhart, 450 F.Supp.2d 544, 559 (E.D. Pa. 2006).

With respect to plaintiff's notice of the charges against him and ability to prepare a response, plaintiff was notified of the charges against him, was interviewed by the agent conducting the investigation on October 4, 2001, and had his union representative present with him at the interview. The Special Agent explained the purpose of the meeting prior to beginning the interview. Subsequently, plaintiff was allowed to provide a written statement of his account of the TWA incident on October 9, 2001, and had another opportunity to further comment on October 11, 2001. Plaintiff's supervisors Barr and Knoche notified plaintiff that they would conduct an interview on November 26, 2001 to ask additional questions raised by the ROI. Plaintiff had knowledge of the purpose of the meeting and his union representative was present.[14] Plaintiff was informed of the proposed suspension, was given the letter written by Barr which detailed the charges against him, and was formally informed of the recommended discipline. The letter also informed plaintiff that if he wished to review the ROI, he would need to call Barr and make a request to see it. Plaintiff requested a copy of the ROI on December 13, 2001, but Barr told plaintiff that while he could have

---

[14]This is the meeting the parties refer to as the Weingarten meeting. Plaintiff's assertion that the Weingarten meeting was called in retaliation for his prior EEO activity is entirely without evidentiary support, and his assertion that the Weingarten meeting caused a hostile work environment is without merit for the reasons discussed above with respect to his hostile work environment claim concerning the suspension itself.

access to the ROI that day, the FAA's Civil Aviation Security Division ACE-700 controlled who would get a copy. <u>See</u> Gov't. Ex. L.

The Court finds that the procedures followed by defendant in imposing plaintiff's suspension gave plaintiff clear notice and an opportunity to be heard, and amply satisfy the due process requirements to which plaintiff was entitled. Plaintiff had no due process right to a copy of the full ROI, as opposed to full access to the ROI, prior to the imposition of the suspension. Defendant is therefore entitled to summary judgment on plaintiff's due process claims.

3. <u>Remaining Claims</u>.

Defendant argues that plaintiff's other claims should be dismissed for failure to establish a prima facie case of discrimination or retaliation because none of the claims rise to the level of adverse personnel actions. Defendant asserts that because the actions alleged by plaintiff did not materially alter the terms or conditions of his employment, they are not adverse employment actions under <u>Ledergerber v. Stangler</u>, 122 F.3d 1142, 1144-45 (8th Cir. 1997). Defendant contends that unless the alleged actions rise to the level of termination, reduction in pay, or changes in benefits that significantly affect plaintiff's future career prospects, they are not adverse personnel actions. The Court agrees that a reasonable employee would not have found the challenged actions materially adverse, <u>Burlington N.</u>, 126 S. Ct. at 2415, and will discuss each claim briefly.

a. <u>Work Schedule of Eight Ten-Hour Work Days per Pay Period</u>.

In complaint items 9 and 21, plaintiff alleges that he was retaliated and discriminated against when he was the only employee in his section who was not allowed a work schedule of eight ten-hour work days per pay period. Defendant relies on the affidavit of plaintiff's supervisor, David R. Barr, which states in pertinent part:

The policy is administrative support people are not allowed to work 10-hour days; they are allowed to work a regular work schedule or the 5-4-9 alternate schedule that [plaintiff] works now.[15] The only people who are allowed to work 10-hour shifts are the 2101 [Specialists] who work on [National Air Space] equipment. I don't know of anywhere in the Region where administrative people are allowed to work 4 ten-hour days.

Barr Affidavit, Gov't Ex. F at 10. Defendant argues that Barr's explanation constitutes a legitimate, nondiscriminatory reason for management's denial of plaintiff's two requests to work a schedule of eight ten-hour work days per pay period. Defendant asserts that plaintiff can offer no evidence that the denial was due to discrimination and retaliation because no administrative personnel were allowed to work the schedule he requested. Plaintiff offers no evidence to dispute defendant's argument.

The Court finds that plaintiff has failed to make a prima facie showing of retaliation or discrimination on his claim that he was not allowed a work schedule of eight ten-hour work days per pay period. Fatal to both claims, plaintiff fails to establish that not being allowed to work eight ten-hour days per pay period is an adverse employment action, or would be materially adverse to a reasonable employee. With respect to his discrimination claim, plaintiff also presents no evidence that the employees who are allowed to work such a schedule are similarly situated to him.[16] The

_____

[15]The "5/4/9" option involved an employee working nine-hour days for eight days and eight hours on the ninth day, so the employee could be off of work one day every other week.

[16]The Administrative Law Judge concluded that plaintiff could not establish a prima facie case concerning the denial of his requested work schedule because two other 334 Computer Specialists, Pam Neitzert and Mike Speno, were not offered a 4/4/10 work schedule. The ALJ also commented that although plaintiff argued he worked on NAS equipment as did the 2101 Specialists, he is not similarly situated to them:

"[I]t is undisputed that complainant was *not* classified as a 2101 Specialist, could not legally certify equipment as the 2101 Specialists did; did not work on radar equipment, scopes, etc., as the 2101 Specialists did; nor could he perform a host of other functions performed by the 2101 Specialists. That is, complainant was a 334 Computer Specialist and *not* a 2102 Specialist. Moreover, complainant was treated

uncontroverted evidence is that regional agency policy is that administrative staff such as plaintiff are not allowed to work eight ten-hour days per pay period. Therefore, plaintiff cannot establish a prima facie case of discrimination. Plaintiff also fails to make a prima facie case of unlawful retaliation, as he cannot establish that a reasonable employee would have found the work schedule issue to be materially adverse, or that the denial was causally connected to his prior EEO activity.

### b. Regional Conference Calls.

In complaint item 8, plaintiff alleges that Barr did not allow him to participate in regional telephone conference calls in which management updated computer specialists about new job-related items, because of retaliation and discrimination. Defendant asserts that plaintiff cannot establish a prima facie case of retaliation or discrimination because there was no adverse employment action. Defendant points to plaintiff's EEOC hearing testimony that neither Barr nor any other agency management person had told plaintiff he could not participate in the teleconferences, and instead Barr stated he would try and get plaintiff's name added to the list of participants. Gov't Ex. E at 10-11. Plaintiff also testified that he knew when the calls were conducted and conceded that he could have called into the conference as other participants did, and that other participants were not called but rather initiated their own inclusion. Id. The telephone number and pass code for the teleconferences had not changed since the time plaintiff participated in them in Kansas City. Id. Plaintiff also testified

---

no differently than the other 334 Computer Specialists. Thus, regardless of complainant's dispute with the agency's characterization of him (and other 334 Computer Specialists as 'administrative' personnel, he was indisputably treated no differently than the other 334 Computer Specialists. I conclude complainant's arguments that the 2101 Specialists were treated more favorably does not evidence unlawful discrimination or retaliation."

Gov't Ex. E at 8-9.

that no one from the St. Louis facility, including Barr, was on the list of participants for the regional teleconferences, but that he did not call in because he "was not invited." Id. Defendant argues that there was no adverse action because plaintiff chose not to participate in the calls merely because he was never formally invited to do so.

The Court finds that plaintiff has not established a prima facie case of discrimination or retaliation on this claim. There is no evidence that plaintiff suffered an adverse employment action with respect to the telephone conferences, or that a reasonable employee would have found this action to be materially adverse. There is also no evidence that defendant excluded plaintiff from the conferences, or that similarly-situated employees did participate in the conferences. In addition, the conferences were regular and recurring, and plaintiff had the ability to participate but chose not to in the absence of a specific invitation. Without a showing of an adverse employment action or a materially adverse action, plaintiff is unable to establish a prima facie case of discrimination or retaliation.

### c. PBX Telephone Training Classes.

In complaint item 13, plaintiff alleges that he has been denied telephone training since January 2001. Plaintiff states that as part of the Settlement Agreement, he was to transfer to St. Louis and would be provided telecommunications training. Plaintiff alleges the denial of training constitutes retaliation and discrimination. In response, defendant argues that although Barr testified that he intended for plaintiff to receive training on administration of the PBX Telephone Systems in preparation for the move to the new building, once Barr's intention became known, the 2101 Specialists' union threatened to file a grievance if the work was turned over to plaintiff, as the 2101 Specialists had administered the telephone system in the current building and wanted to continue to

administer the system in the new building. Barr then decided against training plaintiff on the system. Defendant argues that it was the pressure from the union and not any discriminatory or retaliatory motive that led to plaintiff not receiving training. Plaintiff offers no evidence to dispute defendant's argument.

The Court finds that plaintiff has not established a prima facie case of discrimination or retaliation concerning the denial of training. There is no evidence that any similarly-situated employee outside the protected group received telephone system training while plaintiff did not. There is also no evidence of a causal connection between plaintiff's prior EEO activity and the denial of training. In addition, there is no evidence that the denial of telephone system training constitutes an adverse employment action or a materially adverse action. Morever, even if the Court were to assume that plaintiff made a prima facie showing of discrimination or retaliation, plaintiff has offered no evidence to controvert defendant's nondiscriminatory reason that plaintiff was not given the training because his supervisor feared union backlash, or that illegal discrimination was the real motive. Without such a showing plaintiff's claim fails and defendant is entitled to summary judgment.

d. Participation in Department of Defense Ombudsman Program.

In complaint item 15 plaintiff alleges that on November 9, 2001 management denied his request to participate in a United States Department of Defense activity, because of retaliation and discrimination. Defendant states that when Barr received plaintiff's request to participate in a Department of Defense program as a Volunteer Ombudsman on official time, Barr contacted the agency's Regional Office in Kansas City to determine how to proceed, as Barr had never received a similar request from an employee. Barr testified at the EEO hearing that he denied the request because it required official time and plaintiff already received 120 hours per year of military leave,

and the request came at a busy time because they were preparing to move to a new facility. Defendant concludes that plaintiff cannot establish a prima facie case of retaliation or discrimination because plaintiff (1) cannot establish a causal connection between his supervisor's denial of his request to participate in a volunteer program during work time and his prior EEO activity; and (2) no similarly-situated employees were allowed to participate in the program which was denied to plaintiff.

The Court finds that plaintiff has not established a prima facie case of discrimination or retaliation. First, the Court finds that denial of plaintiff's request to participate in a volunteer program on work time is not an adverse employment action or that a reasonable employee would have found this action to be materially adverse. Second, the evidence presented to the EEOC was that although three employees not supervised by Barr participated in a different volunteer program, no employees supervised by Barr participated in such programs. Plaintiff is therefore unable to establish he was treated differently than similarly-situated employees. Defendant is entitled to summary judgment on this claim.

e. Alleged Warnings by Management to Plaintiff's Co-workers.

In complaint item 17, plaintiff alleges that FAA management had warned his coworkers to watch what they said around plaintiff because plaintiff is "legalistic," that the agency has done so because of retaliation and discrimination, and as a result plaintiff has been subjected to a hostile work environment. At the EEOC hearing, Barr testified that he never warned any employee about plaintiff or told any employee to be careful when speaking to plaintiff. Barr denied that he ever told any employee that plaintiff was "legalistic," and testified that he never overhead any employee refer to plaintiff in that manner. Plaintiff testified that he did not hear anyone refer to him in that derogatory

manner, but had heard from other people that Barr had made the statement. Plaintiff presented the affidavit of co-worker Edward Rock which stated that someone told Rock that plaintiff was "legalistic," but Rock did not remember who that person was.

The Court finds that plaintiff has not established a prima facie case of retaliation or discrimination. First, plaintiff presented no admissible evidence that defendant's management ever referred to plaintiff as "legalistic" or warned co-workers to watch what they said around him. Second, plaintiff cannot establish an adverse employment action as there was no tangible change in his duties or working conditions that constitute a material employment disadvantage, or that a reasonable employee would have found this action to be materially adverse. Third, even if plaintiff had evidence to support this claim, it would not rise to the level of a hostile work environment, which exists only when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris, 510 U.S. at 21. Plaintiff has not presented any evidence that the alleged comments were sufficiently severe or pervasive to alter the conditions of his employment. Defendant is therefore entitled to summary judgment on this claim.

### f. Route Plaintiff Should Drive Between Home and Work.

In complaint item 18, plaintiff alleges that on March 27, 2002, administrative officer Denise Schaefer met with him regarding a travel voucher dated September 28, 2001. Plaintiff alleges that during the meeting Schaefer told plaintiff how to drive from home to work, and how many miles he could claim on the voucher. Plaintiff further alleges that no other employees in his section were required to drive a set route to work, and as a result Schaefer's actions constitute retaliation and discrimination.

Defendant argues that plaintiff cannot establish a prima facie case of retaliation or discrimination. Defendant states that Schaefer testified she was told by Jane Knoche to provide plaintiff with local travel voucher training. To prepare for the training, Schaefer reviewed an Internet program, Map Quest, to determine plaintiff's route from home to work. At the meeting, Schaefer testified she reviewed with plaintiff how to complete Form 1164, the local mileage form, and showed plaintiff the Map Quest result to demonstrate how to complete the travel voucher. Schaefer testified that she told plaintiff to use his actual mileage in preparing the travel voucher, regardless of what Map Quest displayed. Schaefer further testified she did not know plaintiff had been involved in any prior EEO activity until approximately one month prior to the EEOC hearing, when plaintiff contacted her and informed her of his EEO filings.

Defendant contends that plaintiff cannot establish that receiving training on how to complete a travel voucher from the Administrative Officer of his facility was an adverse action, and he also cannot offer any evidence to support his allegation that the agency directed or ordered him to use a particular route to and from work.

The Court finds that plaintiff has not established a prima facie case of discrimination or retaliation. Without a showing of an adverse employment action or that a reasonable employee would have found this action to be materially adverse, plaintiff is unable to establish a prima facie case of discrimination or retaliation. Plaintiff has not established that he was the victim of an adverse employment action based on his meeting with Denise Schaefer concerning how to fill out a travel voucher. Plaintiff does not establish that as a result of the meeting he faced a tangible change in duties or working conditions that constitutes a material employment disadvantage. Cossette, 188 F.3d at 972. Plaintiff cannot establish that a reasonable employee would have found this action to be

materially adverse. In addition, plaintiff cannot establish a prima facie case of retaliation because it was uncontroverted that Schaefer did not know of plaintiff's prior EEO activity at the time she provided the training at issue, and therefore could not have been retaliating against him for that activity. Defendant is entitled to summary judgment on this claim.

g. <u>Work Location</u>.

In complaint item 20, plaintiff alleges that FAA management has created a hostile work environment since April 28, 2002, when the TRACON-75 facility relocated to St. Charles, Missouri. Plaintiff is the only person in his division assigned to work inside the computer equipment room, and he believes the two other persons who work in the same room have other offices available to them. Plaintiff alleges that as result of his location he is the only individual in his section who does not have a heated office, although he concedes it is air conditioned. He further alleges that the electromagnetic door latch to his office regularly malfunctions and was not repaired despite his repeated requests. Plaintiff contends there was other work space in the new facility to which he could have been reassigned.

Barr testified at the EEOC hearing that he was unaware of any problems with the computer room when the office assignments were initially made. The room to which plaintiff was assigned was specially designed for computer equipment with special carpeting, chairs and work surfaces to prevent damage to the equipment. Barr testified that office space assignments were made "on the form fit function," and that plaintiff was assigned to that particular room because it was the "Local Area Network IRM" room where the other Air Traffic employees worked who performed similar functions as plaintiff. Barr testified that the two other employees who are permanently assigned to plaintiff's

same area do not have any other work space, and had never complained about the temperature of the room.

Barr testified that after plaintiff complained about the room, he had a noise sampling conducted throughout the St. Charles facility, which showed that the noise in plaintiff's work area was within acceptable Occupational Safety and Health Administration limits. Barr testified that other employees, including Environmental Technicians, are assigned to work in a room with at least five computer systems. Barr testified he had the Industrial Hygienist and Environmental Technicians check the ventilation of the room, which was found to be adequate, and Barr instructed the construction crew working in the new building change to the lock mechanism on the security door to lessen the noise. The latter project took approximately thirty days because parts had to be ordered. Barr testified that the computer room maintained a constant seventy-five degree temperature generated from the computer equipment, and that plaintiff had never personally complained to Barr about alleged cold temperatures. Barr testified that he had no awareness of which rooms were heated and which were not when he made office assignments, but that since he was made aware of plaintiff's concerns about the heat, he would provide an auxiliary heater for the room during cold weather.

Finally, Barr testified that plaintiff could not be reassigned to a different space because no other office space was available. One vacant storage room that plaintiff mentioned was not designed to be an office and had a duct but no thermostat to regulate heat or cold. Although Barr moved into Jane Knoche's office when the latter was transferred to Kansas City, leaving Barr's old office vacant, Barr testified that he was told not to make any office space allocation changes because a reorganization was taking place and the agency's Systems Management Office was being closed and its personnel reassigned to remaining facilities, including the one where plaintiff and Barr worked.

Defendant concludes that plaintiff cannot provide any evidence to support his claim of retaliation or discrimination for his office assignment because defendant has offered legitimate, nondiscriminatory reasons for the action taken by FAA management.

The Court concludes that plaintiff has failed to establish a prima facie case of either retaliation or discrimination with respect to his assignment to work in the computer room. Plaintiff has not shown that assignment to the computer room was an adverse employment action, that a reasonable employee would have found this action to be materially adverse, or that he was treated differently than similarly-situated employees outside the protected group. The evidence shows that plaintiff was treated the same as similarly-situated employees. Plaintiff has also failed to show that the conditions in the computer room constitute a hostile work environment. To constitute a hostile work environment, harassment must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris, 510 U.S. at 21 (quoted case omitted). Defendant is therefore entitled to summary judgment on this claim.

### h. Accusation Regarding Damage To Government Vehicle.

In complaint item 22, plaintiff alleges that on June 24, 2002, then-facility manager Jane Knoche accused him of damaging a government vehicle (a Chrysler van), as a result of retaliation and discrimination. Plaintiff testified at the EEOC hearing that he did not break the items, but found the van in a state of disrepair and reported the items to Knoche in early June. Plaintiff testified that on June 12, 2002, he was assigned to take the van for repairs. Plaintiff testified that Knoche commented to him on June 24, 2002, "don't break the van again," and that he felt intimidated and harassed by this accusation.

Jane Knoche testified that she needed to use the van for business on June 24, 2002, and discovered that several items were broken, including the electric window. Knoche's secretary told her that plaintiff was the last person to use the van. Knoche testified that she expressed her frustration to plaintiff that no steps had been taken to repair it, and assigned plaintiff and her secretary to take it for repair. Knoche did not recall making the statement "don't break the van again," but said if she did make such a comment, it would have been in a jocular manner.

Defendants argue that plaintiff did not suffer an adverse employment action as a result of this incident, but that he was merely questioned about the broken items. Defendants further argue that "stray remarks in the workplace, statements by non-decision makers, or statements by decision makers unrelated to the decisional process itself will not suffice." Gagnon v. Sprint Corp., 284 F.3d 839, 848 (8th Cir. 2002).

The Court finds that plaintiff has not established a prima facie case of retaliation or discrimination. Assuming that Knoche made the statement at issue in an intimidating manner, such a statement does not rise to the level of an adverse employment action, and a reasonable employee would not have found this action to be materially adverse. Plaintiff was not disciplined concerning the van. Plaintiff has offered no evidence that he suffered any adverse employment action or that a reasonable employee would have found this action to be materially adverse, and thus cannot establish a prima facie case. Moreover, plaintiff has presented no evidence that the comment was related to his prior EEO activity. Defendant is therefore entitled to summary judgment on this claim.

     i. TRACON-75 SSC Building Awards.

In complaint item 23, plaintiff alleges that he was denied TRACON-75 building awards for work performed during 2001 and 2002, and that he was the only employee or one of a few employees

at TRACON-75 SSC not to receive any cash and/or time off awards. Plaintiff alleges this denial was based on retaliation and discrimination, as he received many letters of appreciation for his work on installation of the new building in St. Charles, but no cash award or time off.

Barr testified at the EEOC hearing that he recommended cash awards for two employees, Eichelberger and Nichols, each of whom worked at the new facility for a year prior to the actual move, performing key functions in connection with equipment installation and monitoring. Barr testified that he recommended a number of employees for time off awards and listed the accomplishments of each person that factored into his decision to recommend them for a time off award. Barr testified that plaintiff's role at the new facility was to set up administrative work stations and Barr did not believe his contributions warranted an award. Defendant argues that plaintiff did not offer any examples of work he completed which was of a similar nature to that performed by his colleagues who did receive awards.

Plaintiff bears the burden to proffer "specific, tangible evidence" that employees who were "similarly situated in all respects" to him received different treatment from management. Rose-Maston, 133 F.3d at 1109 n.4 (first quote); Gilmore, 319 F.3d at 1046 (second quote). The Court finds that plaintiff has not met this burden. Although plaintiff presents evidence that he may have been the only employee at TRACON-75 SSC who did not receive a cash or time off award in 2001 or 2002, he presents no evidence that he performed the same type of work as any individual who did receive an award. The Court notes again that plaintiff is an administrative Computer Specialist and the other employees are technician 2101 Specialists with different job duties, so it cannot be assumed that plaintiff's work was the same as theirs. Plaintiff's unsupported assertion that he deserved an award is not evidence, because "unsubstantiated and conclusory allegations are insufficient to support

an inference of [discrimination]" and "cannot create a genuine issue of material fact precluding summary judgment." Rose-Maston, 133 F.3d at 1109. Plaintiff also fails to present any evidence to establish that his prior EEO activity was related to Barr's decision not to select him for an award. Defendant is therefore entitled to summary judgment on this claim.

j. Superior Contribution Increase Award.

In complaint item 24, plaintiff alleges that he applied for and should have received a Superior Contribution Increase Award ("SCI award") in 2002 based on his many contributions towards the goals of the FAA, but did not receive an SCI award as a result of retaliation and discrimination. It was undisputed that plaintiff received an SCI award from Barr in 2003. In support of this claim, plaintiff points to several letters and certificates of commendation he received for work he completed during 2002.

Barr testified at the EEOC hearing that plaintiff turned in his application for a SCI award on October 29, 2002, although Barr had announced at a staff meeting in August 2002 that applications for SCI awards must be received by October 1, 2002. Barr testified that he was required to formulate a list of nominees by October 12, 2002 and forward it to the Gateway Systems Management Office, which in turn forwarded it to the Kansas City Regional Office. The eleven persons selected to receive the SCI award were named on October 18, 2002, eleven days before plaintiff submitted his application. Barr testified that he accepted plaintiff's application on October 29, 2002, but told plaintiff that the application was untimely and selections had already been made. Barr testified that plaintiff was the only applicant to turn in an application past the deadline. Defendant argues that plaintiff's claim fails because plaintiff can offer no evidence that his failure to receive a SCI award in

2002 was due to retaliation or discrimination, as it was directly related to plaintiff's untimely submission of an application.

The Court concludes that plaintiff cannot establish a prima facie case of retaliation or discrimination concerning the SCI award. With respect to the discrimination claim, plaintiff has not met his burden to offer "specific, tangible evidence" that employees who were "similarly situated in all respects" to him received different treatment from management. Rose-Maston, 133 F.3d at 1109 n.4 (first quote); Gilmore, 319 F.3d at 1046 (second quote). Plaintiff has not presented any evidence that an individual outside of the protected group, or any other individual, turned in a late SCI award application but was still granted an award. Without such evidence, plaintiff cannot show discriminatory treatment. Likewise, plaintiff has failed to make a prima facie case of unlawful retaliation. Plaintiff offers no evidence to link the denial of an SCI award in 2002 to his protected activity. Moreover, even if plaintiff were assumed to establish a prima facie case, he offers no evidence to rebut defendant's nondiscriminatory reason for denying the award, that plaintiff did not submit a timely application. Defendant is therefore entitled to summary judgment on this claim.

> k. Labor Distribution Reporting Award.

In complaint item 25, plaintiff alleges that he is the only computer specialist under the management of the Gateway Systems Management Office who did not receive an award for work on the national Labor Distribution Reporting ("LDR") program in 2002 and 2003, and that this denial was the result of retaliation and discrimination. Plaintiff testified that two employees from another office, Pam Neitzert and Ken Eaker, had received cash or time off award for their work on the LDR program. Plaintiff testified that he believed Barr found his work on the LDR program significant and valuable, and therefore Barr should have nominated him for an award.

Barr testified at the EEOC hearing that he did not nominate any of his employees for either a cash or time off award for any work performed with the LDR program because his employees had minimal involvement with the program, and he did not know awards were being given out for work performed in conjunction with it. Barr testified that the two individuals who received awards were not under his supervision, his supervisors did not ask him to make nominations, and none of his employees, including plaintiff, asked him to submit nominations.

The Court finds that plaintiff has not met his burden to establish a prima facie case of retaliation or discrimination on the claim for denial of the LDR program award. While plaintiff offers evidence that he is the only computer specialist who did not receive an LDR program award, he presents no evidence to establish that he was similarly situated to the two specialists who did receive awards, because he has a different supervisor than they do and has not established that he performed comparable work. Plaintiff has also not presented any evidence linking the denial of the LDR program award to his prior EEO activity. It is uncontroverted that plaintiff's supervisor did not know the LDR program award existed and did not nominate any employee for the award, whether or not those employees were outside the protected group or had participated in prior EEO activity, and did not know the award existed. Plaintiff's subjective belief that he was entitled to an award is not evidence, because "unsubstantiated and conclusory allegations are insufficient to support an inference of [discrimination]" and "cannot create a genuine issue of material fact precluding summary judgment." Rose-Maston, 133 F.3d at 1109. Defendant is therefore entitled to summary judgment on this claim.

l.  TRACON-75 SSC Acting Manager Position.

In complaint item 26, plaintiff alleges that between January 16, 2001 and October 1, 2004, he was denied the ability to serve as an acting TRACON-75 SSC Manager (Barr's position), a career-enhancing opportunity.  Plaintiff alleges that all of the other I-band level employees in his section were given the opportunity to serve as acting Manager on a rotating basis, but he was not, as a result of retaliation and discrimination.

Defendant argues that plaintiff was never selected to serve as acting Manager because he did not meet the requirements provided in the vacancy announcements, and therefore cannot establish a prima facie case of retaliation or discrimination.  Barr testified at the EEOC hearing that the basic qualifications for his position required the incumbent to be an FV-2101 Airway Transportation System Specialist with 52 weeks at the I-Band pay level, and that these same qualifications applied to selecting a person to fill his position on a temporary basis in his absence for a period of fourteen days or more.  Barr testified that only a person with these credentials would be capable of understanding all of the operational procedures necessary to interface with Air Traffic personnel, and the person would have to handle any radar or other equipment outages on a moment's notice, and deal with emergencies such as an aircraft accident.  Barr testified that only four of the 2101 Specialists in his unit met these criteria.  Barr testified that the mission of the TRACON-75 SSC was to provide maintenance support and restoration to the National Air Space equipment.  Barr states that only 2101 Specialists could render decisions on radars and National Air Space equipment, issue orders, certify equipment, and perform other crucial duties.  Barr also testified that if he were to be absent for a period of less than fourteen days, any 2101 Specialist could serve as a "point of contact" for a short period of time.

Plaintiff testified that although he was not a technician, he would avail himself of the resources necessary to perform in the acting Manager position. For example, if he were asked as acting Manager to handle a problem with radar, he would ask the technicians and higher level management to solve the issue presented.

The Court finds that plaintiff has not met his burden to establish a prima facie case of retaliation or discrimination with respect to denial of the acting Manager position. The uncontroverted evidence showed that only 2101 Specialists with at least 52 weeks of experience at the I-Band level were qualified for a temporary promotion to acting Manager. These requirements were taken directly from the vacancy announcement for the position. In addition, even anyone serving as a "point of contact" during a managerial absence of less than fourteen days had to be a 2101 Specialist.

Plaintiff cannot establish a prima facie case of discrimination because he is not similarly situated to the 2101 Specialists with at least 52 weeks of experience at the I-Band level--the only persons qualified to serve as acting Manager. Plaintiff, as an administrative Computer Specialist, cannot be considered interchangeable with a 2101 Specialist technician with the qualifications listed above. Plaintiff's opinion that he could serve in the position and seek help from technicians and other managers in the event of a problem is not evidence that can support his claim. Because plaintiff is not qualified for the position, its denial cannot be considered an adverse employment action.

Plaintiff cannot establish a prima facie case of retaliation because a reasonable employee would not have found this action to be materially adverse, and he has presented no evidence to link the denial of the acting Manager position with his prior EEO activity. Moreover, if plaintiff had established a prima facie case, he has not offered any evidence that the FAA's nondiscriminatory

reason for denial of the acting Manager position, i.e., that plaintiff lacked the posted qualifications for the position, is a pretext and that illegal discrimination was the true reason. Defendant is therefore entitled to summary judgment on this claim.[17]

        m. <u>Safety Shoes</u>.

In complaint item 28, plaintiff alleges that management purchased or offered to purchase safety shoes for everyone in his section in 2002, but did not purchase safety shoes for him until 2004. Plaintiff alleges that because he had to wait two years to receive the safety shoes he was the victim of retaliation and discrimination. Plaintiff testified at the EEOC hearing that in August 2002, Barr directed him to purchase safety shoes and stated the government would pay for them, but in September 2002, Barr told him that a budget issue had arisen which precluded purchase of the safety shoes. Plaintiff testified that almost every other employee had safety shoes provided by the agency, and that occasionally his job required him to move heavy objects such as computer equipment, for

---

[17]The Administrative Law Judge made the following comment in her discussion of plaintiff's claim concerning denial of the acting Manager position:

        The undersigned would be remiss if I failed to note that the arguments advanced by complainant at the hearing on this issue closely mirrored those arguments advanced *supra* by complainant in connection with floating meal breaks, alternative work schedules, etc. Specifically, complainant's contentions all revolve [sic] his demand to be treated the same as the 2101 Specialists. I conclude complainant failed to accept that he was *not* classified as a 2101 Specialist; could not legally certify equipment as the 2101 Specialists did; did not work on radar equipment, scopes, etc. as the 2101 Specialists did; nor could he perform a host of other functions performed by the 2101 Specialists. That is, complainant was a 334 Computer Specialist and *not* a 2101 Specialist. Complainant was simply not qualified to serve as Acting Manager of TRACON-75 (i.e. a supervisory 2101 Specialist position occupied by Supervisor Barr) nor was he qualified to serve as a point of contact for the unit in Barr's absence.

Gov't Ex. E at 35.

which safety shoes would have been valuable. Plaintiff does not allege that safety shoes were a necessary requirement to protect him in the course of his duties.

Barr testified that he withdrew his offer to provide safety shoes to plaintiff after he learned that he was not getting the $2,500 he had requested in his fiscal year 2002 budget for safety shoes, hearing protection, safety glasses and other equipment, and instead would receive only $1,200. Barr testified that upon learning he would have limited funds for safety equipment, he decided to purchase eleven pairs of safety shoes at $125 each for the technicians who regularly moved forklift pallets, accepted deliveries for the facility from loading docks, and performed heavy lifting activities in the operation of the facility. Barr testified that the type of lifting plaintiff performed, such as lifting computer equipment, did not compare to the lifting performed by technicians who regularly lifted shipping containers weighing thousands of pounds with forklifts. Barr testified that he told plaintiff he had run out of money, and asked plaintiff to hold off on the purchase for the time being. Barr testified that plaintiff never told Barr that he wanted safety shoes. Barr also testified that if plaintiff wished to have safety shoes, they could be purchased and paid for out of the fiscal year 2004 budget.

The Court concludes that plaintiff fails to establish a prima facie case of retaliation or discrimination with respect to the denial of safety shoes. The evidence is uncontroverted that Barr offered plaintiff the shoes in 2002, but then retracted the offer because of budgetary constraints. Plaintiff does not offer evidence that any similarly-situated employee was offered shoes, as the evidence shows the technician employees who received safety shoes in 2002 were doing heavy lifting not required of plaintiff. In addition, under these facts, the Court finds that denial of the safety shoes in 2002 was not an adverse employment action and that a reasonable employee would not have found this action to be materially adverse. Further, plaintiff offers no evidence to establish a causal link

between the delay in receiving safety shoes and his previous EEOC activities. For these reasons, defendant's motion for summary judgment should be granted on this issue.

n. Change of Work Assignment.

In complaint item 29, plaintiff alleges that from July 2003 until March 2004 his work assignment was changed so that he no longer provided computer support to the FAA offices of St. Louis NAVCOM, St. Louis RADAR and the office of the St. Louis Facility Manager. Plaintiff states that because his work schedule was changed, he was denied many advancement opportunities, and the change was a result of retaliation and discrimination. Plaintiff testified at the EEOC hearing that in June 2003, managers and technicians at these three facilities stopped calling him for computer support services and instead called on Pam Neitzert and Mike Speno from the Gateway Systems Management Office ("SMO") for computer support. Plaintiff testified that this work change occurred after Jane Knoche returned to St. Louis from a detail to Kansas City.

Knoche testified that when she returned to St. Louis in July 2003, she was Manager of the St. Louis NAVCOM, and John Derado was Manager of the office of the St. Louis Facility Manager. Derado had been the Assistant Manager of SMO prior to becoming the head of the St. Louis Facility manager in spring 2003. Knoche testified that Derado was very vocal in his opinions that SMO personnel should provide computer support for the three offices. Knoche testified that based on Derado's input, she recommended that the employees at St. Louis NAVCOM seek computer support from the SMO, which made more sense because the SMO was located seven miles from the three sites, while plaintiff's facility at TRACON-75 was twenty-five miles away.

Defendant argues that plaintiff has failed to establish that management's decision to have computer support assistance from a closer facility was an adverse action because providing the

additional computer support was not part of plaintiff's formal duties. Plaintiff does not respond to defendant's argument on this claim.

The Court concludes that plaintiff cannot establish a prima facie case of retaliation or discrimination on the work change claim, because he has not shown an adverse employment action or that a reasonable employee would have found this action to be materially adverse. The record indicates that plaintiff's formal job duties did not involve computer support services for the three facilities. Plaintiff presents no evidence that the removal of these support duties had any effect on his employment title, salary or benefits. A mere alteration of job responsibilities with minor changes in working conditions and no reduction in pay or benefits does not constitute an adverse employment action. Ledergerber, 122 F.3d at 1144. "Otherwise every trivial personnel action that an irritable . . . employee did not like would form the basis of a discrimination suit." Id. (quoting Williams v. Bristol-Myers Squibb Co., 85 F.3d 270, 274 (7th Cir. 1996)). Defendant is therefore entitled to summary judgment on this claim.

o. Observance of Religious Holiday.

Finally, in complaint item 10 plaintiff alleges that "[m]anagement denied the plaintiff the recognition of a religious holiday on April 16, 2003" and thereby created a hostile work environment. Complaint at 8, ¶ j. Plaintiff alleges that management required him to work outside of his regular work schedule on the evening of the first night of the Jewish holiday of Passover, when "management had no reason to believe that there was any hardship on the agency, requiring plaintiff to work the night of a Jewish holiday." Id. Plaintiff alleges that as a result of this requirement, he missed most of his family's religious observance for the first night of Passover. Plaintiff alleges that defendant made him work late on April 16, 2003 because of retaliation and discrimination.

Plaintiff testified at the EEOC hearing that he submitted a request to Barr to use compensatory time for April 17, 2003, which was the first day of the religious holiday of Passover. It is undisputed that Barr granted the request, and that the holiday officially began at sundown on the evening of April 16, 2003.  Plaintiff's normal work day ended at 3:45 p.m.  Plaintiff testified that he was working on co-worker Candy Hoffmann's old and new computers, and that at approximately 3:30 p.m., Barr asked him to back up Hoffmann's old computer system and restore her new one. Plaintiff testified that he explained to Barr that Hoffmann was "fully operational," and in the absence of being able to obtain electronic mail on her new computer, she could get it from the old computer or via the Internet.  Plaintiff testified that he told Barr he planned to leave to celebrate Passover, but "it was his understanding" that Barr instructed him to stay and complete the work no matter how long it took to get the job done.  Plaintiff testified that it was 6:55 p.m. before he finished working on Hoffmann's new computer.  In his reply memorandum, plaintiff states that on April 2, 2001 he wrote Barr a memo concerning adjustment of his work schedule for Jewish holidays, which stated in part, "all [Jewish] holidays begin at sundown of the day preceding the date shown and end at sundown of the (last) day shown."  <u>See</u> Brasch Ex. 59.  Brasch also gave Barr a list of Jewish holidays and dates which stated that the holidays begin at sundown of the preceding day.  <u>See</u> Brasch Ex. 58.

Barr testified and denied making the statement plaintiff attributed to him.  Barr testified that he had never consciously denied plaintiff any type of religious leave and would not have said that plaintiff had to finish the job before he could go home.  Barr conceded that he might have told plaintiff to try and get it done before he left, but testified that plaintiff did not mention Passover to him or state that he needed to leave for a religious holiday.  It was uncontroverted that Barr had always allowed plaintiff to take off of work for religious holidays both before and after the April 2003

incident, and had allowed plaintiff to earn compensatory time prior to Jewish holidays so plaintiff could use compensatory time rather than annual leave for the time off.

Defendant contends that even assuming Barr forced plaintiff to stay, there is no evidence to support plaintiff's contention that this was an act of retaliation or discrimination, and therefore this claim should be dismissed.

In this context, to establish a prima facie case of religious discrimination, plaintiff must show he had a bona fide religious belief that conflicted with an employment requirement, he informed his employer of his belief, and he suffered an adverse employment action. Cruzan v. Special Sch. Dist., #1, 294 F.3d 981 (8th Cir. 2002); Seaworth v. Pearson, 203 F.3d 1056, 1057 (8th Cir. 2000) (per curiam); Vetter, 884 F. Supp. at 1305 (citing cases). The Court finds that plaintiff has not established a prima facie case of discrimination. When the facts are viewed in the light most favorable to plaintiff, he establishes the first two prongs of the prima facie case but fails to demonstrate that he suffered an adverse employment action. Plaintiff offers no evidence of any tangible change in his duties, working conditions, salary, title or benefits that constitute a material employment disadvantage. Plaintiff's personal distress at being required to work during the first part of the Passover holiday and missing his family's religious observance, while certainly understandable, does not constitute an adverse employment action. Because plaintiff cannot establish the existence that a reasonable employee would have found this action to be materially adverse, his retaliation claim also fails. In addition, plaintiff has not presented any evidence to establish a causal connection between the defendant's action in requiring him to work late on April 16, 2003 and plaintiff's prior EEO activity.

Defendant's actions do not rise to the level of a hostile work environment because plaintiff's harm was not "sufficiently severe or pervasive to alter the conditions of the victim's employment and

create an abusive working environment." Harris, 510 U.S. at 21 (quoted case omitted).  Defendant is therefore entitled to summary judgment on this claim.

**Conclusion**.

For the foregoing reasons, the Court concludes that claims 6, 11, 12, 14 and 27 of the Complaint should be dismissed for failure to exhaust administrative remedies.  Defendant's motion for summary judgment should be granted as to all other claims of the complaint.

Accordingly,

**IT IS HEREBY ORDERED** that defendant's alternative motion for summary judgment is **GRANTED**.  [Doc. 22]

**IT IS FURTHER ORDERED** that claims 6, 11, 12, 14 and 27 of the Complaint are **DISMISSED** for failure to exhaust administrative remedies.

An appropriate judgment and order of dismissal will accompany this memorandum and order.

**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**

Dated this  21st  day of March, 2007.